Oral argument is 15 minutes for Plaintiff, 10 minutes for the Intervenor, and 25 minutes for the Defendant. We have Ms. Occhialino for the Appellant. Good morning. May it please the Court, my name is Anne Noel Occhialino for the EEOC as Appellant, and I'd like to reserve three minutes of my time for rebuttal. The Commission asked this Court to reverse summary judgment as to both of the claims that the EEOC brought below. That includes the sex discrimination claim on behalf of Amy Stevens, a transgender woman, as well as the clothing benefit claim that we brought on behalf of a class of women who were denied the benefits accorded their male counterparts. With this Court's permission, I'd like to start with what I think is the heart of the matter on appeal and the most difficult issue for you to resolve, which is the District Court Judge's ruling that RFRA bars our Title VII claim on behalf of Amy Stevens. This case really pits the religious liberties of the company against Ms. Stevens' Title VII right, which Congress gave her to be free of discrimination in the workplace. The District Court Judge ruled that the religious liberties of the company override Ms. Stevens' rights, but respectfully, we disagree. As this Court knows, RFRA imposes a two-part burden-shifting framework. The first part of that requires the religious claimant, here the company, to establish that the exercise of religion was substantially burdened by the government action. That's a two-part embedded into that framework, exercise of religion and substantial burden, which are separate. In the EEOC's view, the exercise of religion was not established here, and the company fell short of meeting its burden because it failed to point to any religious doctrine or tenet that required it as part of its Christian religious beliefs to refrain from hiring a transgender worker. Do they have to point to an established tenet, or can they say that it's part of their beliefs? I don't know about established, but I do think that there has to be a tenet or doctrine that they identify that compels them to take an action or not to take an action. I think Hobby Lobby does have language, which makes it harder for us after Hobby Lobby, but even Hobby Lobby itself doesn't go so far as to say a religious claimant can simply declare that I'm being forced to run my business in some way that offends my religious beliefs. There's language in Hobby Lobby, even at the beginning of the decision, where Justice Alito is trying to cabin the impact of Hobby Lobby going down the line. He says, our holding is very specific. We do not hold that for-profit companies can opt out of any law they judge incompatible with their sincerely held religious beliefs. So I think that there's still room for you to decide whether exercise of religion and substantial burden were impacted, and you did that in the United States v. Barnes case, which was a case where the religious claimant stated that he, as part of his religion, was required to grow marijuana and donate it back to the church. And this court said, we don't get into the business of deciding the centrality of religious beliefs to tax. We do still have to look to see whether your exercise of religion was actually impacted, whether your religion requires you to grow the pot and donate it back to the church. So I think there's still room for you to do an analysis, and we cited several cases in our briefs that are not employment cases like this one is, but where courts still have found that exercise of religion wasn't impacted. For instance, a case where somebody wrote an email saying, I'm against same-sex marriages. I don't think you should have them in the religion in the chapel at the Air Force Academy. And the court there said, there's nothing about your exercise of religion that's implicated because you haven't said your religion requires you to publicly voice your dissent to same-sex marriages. Do you know in this case whether or not Harris Funeral Home had a policy of refusing to embalm transgendered people? That's a good question. I don't know the answer to that question. I know nothing specific about whether they would embalm or not embalm a transgender worker. There is testimony in the record from the owner's company, though, that they serve people of every religion or no religion. He mentions people who are Jewish, people who are Hindu, Chinese religions, no religions at all. So it seemed that they opened their doors to everybody, but nothing specific about embalming transgender people who had passed away. Suppose a religion said as a central tenet that men and women could not work in the same workplace. Would there be a substantial burden then if the employment laws were asserted to apply there? So you're positing to me a hypothetical where the employer points to an actual tenet of the religion. Right. It's a small religion, and it developed its own views relatively recently. I'm making this up, obviously. I don't know whether it would interfere with their exercise of religion if they could point to the tenet that said that. It would be hard to show how that would – perhaps they could show exercise of religion if they said that, but that would just move the analysis over to what I think is my opponent's most difficult part of the argument, which is compelling interest in least restrictive means, because the least restrictive means talks about and encompasses the idea of do we impose burdens on third parties. So in your hypothetical, to me, it would impose a burden on men and women. And before RFRA, after RFRA, the court has recognized that when we're talking about alternatives, they can't impose burdens on third parties. Cutter v. Wilkinson talks about that. Hobby Lobby itself talks about that. Justice Alito talks about that. And Justice Kennedy is concurring, and Justice Ginsburg in her dissenting opinions talk about that. And that, I think, is the fundamental flaw in the company's argument. Justice Alito, when he's talking about burdens, in footnote 37 of the opinion, cites the Cutter v. Wilkinson acknowledges we can't burden others. And in Hobby Lobby, the court was able to rule in favor of the company because, according to Justice Alito, using his words, the impact on women was precisely zero, because HHS, Health and Human Services, there was a pre-established way for women to access the four methods of birth control, to which the employer had a religious objection. And in Holt v. Hobbs, which came after Hobby Lobby, Justice Ginsburg wrote a concurring opinion. She said, I can join this opinion here because there is no burden imposed when we allow a Muslim prisoner to grow a longer beard. So that's critical to your analysis. And burdens, you don't want to wander into a territory where you're confronting the Establishment Clause. Cutter v. Wilkinson said there is no Establishment Clause problem because we do consider the burdens imposed on others. So I can't think of any other case where a court has held under Title VII that RFRA provides a defense and bars a Title VII suit seeking to enforce the statutory rights of an individual because of the religious beliefs of the company. I hope that you don't become the first to hold that. So as I said, religious exercise, substantial burden, I think there is still space for you to do analysis. I think it's important, but the easier path for us to move forward and secure reversal of summary judgment here would be for the least restrictive means. And you haven't asked me, but we think that the lower court judge was correct in recognizing that we do have a compelling interest in enforcing Ms. Stevens' rights under the statute, the rights that Congress gave to her. We agree that under RFRA, we have to do a to-the-person analysis. That's the law from RFRA and also from Ocentro. But contrary to what the company argues on appeal, we met that burden here. We're not just talking about a generic interest in eradicating discrimination from the workplace, although I think that's enshrined in Supreme Court precedent and your precedent. What we're talking about here, the compelling interest is enforcing Ms. Stevens' rights to work free of discrimination. So the least restrictive means that the company has forwarded on appeal is they seem to have abandoned their argument that the EEOC had to pick up the tab to pay Ms. Stevens her salary over a course of time or to pay another funeral home to employ her. But they argue on appeal, as I understand it, that we just should not have, we shouldn't enforce Title VII at all against a company that deals with emotionally distressed individuals or a company that has public-facing employees. Respectfully, that is not a least restrictive alternative that works because a least restrictive alternative must achieve equally well, those are the words of Justice Kennedy, it's a concurring opinion, or it must achieve all the aims. I'm paraphrasing Justice Alito in his majority Hobby Lobby decision. But the alternative that they propose wouldn't achieve anything as to Ms. Stevens' rights under the statute, and that's why this Court should reject that. If you have more questions about RFRA, I'm happy to answer it, or I could say a few words about our clothing benefit claim. The clothing benefit claim is an important issue in the case, so if you'd like to address that. It is, and it's important to the Commission. We believe that the Court erred in holding that we couldn't have pursued relief on behalf of the women who were denied the same benefits accorded to their male counterparts. And to clarify, it wasn't just funeral directors who were receiving clothes, it was people who worked with the public short of being a funeral director, and for many years the company provided those benefits only to men and not to women. Now, during the course of our reasonable investigation here, we learned of the clothing benefit violation. So to be sure, the charge was just about sex discrimination and discharge from Amy Stevens. But when our investigator was talking to the business manager and was asking why was Amy Stevens fired, the answer was because she refused to wear the company-provided suit, tie, and jacket. The follow-up question from our investigator was, oh, do women receive the same? And the answer was no, not in the last 10 or 15 years. So we found it during the course of our reasonable investigation, and we believe that Bailey slightly misstates what the standard should be. It's not an abstract question of what could we reasonably have expected to follow from the charge, but whether the investigation that actually occurred was reasonable and whether we found the violation during that. Do you think that Bailey has been overturned by the Supreme Court? I think that Bailey is in tension with General Telephone. General Telephone has been around for a long time, Your Honor, but I think that you could revisit it under the Husted case, H-U-S-T-E-D, which says an intervening Supreme Court case entitles you to reconsider a panel decision. And we cite in our brief to EEOC versus Shoney's, which shows some tension at least with Bailey's decision, because in that case, when we received a charge of national origin and sex discrimination, we sued, but we added race. Well, under Bailey, that doesn't really fly, so it seems like there's some inconsistency in your own precedent. But in our view, the commission does not have to turn a blind eye to a violation that we find during the course of a research investigation. That would be an abdication of our duties and responsibility to enforce the public interest and ensure a workplace free of discrimination. The district court suggests that we have to go backwards and file a commissioner charge. Respectfully, that would not be a good use of our time and our resources. The investigation that we can do when we find a violation is the same one we could do if we have to start over and do a commissioner's charge. Is there any additional process that happens if you go back? No, the investigation would be the same. So whether we do a little investigation, a big investigation, it doesn't hinge on whether we have a commissioner's charge or we found the violation during our investigation. And here I think our investigation was adequate to show, it's really undisputed, that there were no clothing benefits given to women at all until October 2014, a year after we filed our lawsuit, and even then it wasn't equal. And there were client-facing women? Correct. Absolutely, there were. I'll save my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. John Knight for the intervener, Amy Stevens. I'd like to reserve two minutes for rebuttal, if I could. This case is about my client being fired from her job at a funeral home because she is transgender and was going to present as a woman consistent with the person she knew herself to be. RFRA does not provide a license to discriminate to employers because of their religious beliefs, and getting rid of the duress code here failed to address the government's interests because those interests were about her loss of job. Those interests were about stopping discrimination and the harm to my client in terms of losing her job. The district court erred by reading the EEOC's case very narrowly as about sex stereotypes motivated or finding that it was about sex stereotypes with respect to the gender duress code only. The EEOC had argued more broadly that this case was about sex-based stereotypes in general motivating my client's firing. First of all, that misconstrues the factual record here. The funeral home's owner, Mr. Ross, testified that he fired Ms. Stevens because she was no longer going to represent herself as a man since he refused to recognize my client's identity as a woman, and that he wanted to dress as a woman. So it wasn't just the dressing, it was the being and presenting fully as a woman. So addressing or fixing the duress code was not going to address the problem. This court's rulings in previous cases have addressed already that discrimination against transgender people is by its very nature sex stereotyping. It is discrimination on the basis of sex. So in Dodds, the court recognized that the discrimination was against a transgender person is because a person is sex discrimination because it's discrimination against a person who is defined precisely because of the perception that his or her behavior transgresses gender stereotypes. Those stereotypes come into play in things like dress, but in many other ways, including the identity as a woman which fails to comply with the stereotypes that we know and understand, which are that people who were identified as male at birth, we expect to be male for the rest of their lives, and to not have a male or to not have a female gender identity as my client did. That makes a difference for this case, Your Honor, both in terms of the least restrictive alternative analysis, since the district court looked at the government's interest very narrowly as about gender or stereotypes with respect to dress codes, but it also will make a difference in terms of an ultimate trial with respect to the damage to my client. What we would, and therefore it's important for this court to apply its precedents from the Dodd decision, as well as Barnes and Smith, to address the full scope of discrimination here. I mean, all of those cases were sex stereotype cases, right? They were. Okay. Is this a sex stereotype case? This is a sex stereotyping case. Okay. And is it a sex stereotyping case in each of its incarnations? I mean, whether it's about dress, whether – all of the claims are sex stereotyping claims, right? They are, although I would submit, Your Honor, that this is discrimination not only on the basis of sex stereotyping, but because it is based on sex-based characteristics. That is, it is the discrimination against – it is the conflict between my client's gender identity and her sex-assigned at birth that is also a sex stereotype. So that's why in the Dodd decision, this court recognized that a person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. So by its very nature, discrimination against a transgender person is sex stereotyping. This – turning to the burden here, Your Honor, I think the – and I'm sorry, the RFRA analysis, I'd like to simply address a couple points with respect to that. First of all, as Ms. Ocolino addressed, the Supreme Court has repeatedly recognized that harm to third parties is something that must be taken into account, and that there was not – in the Burwell case, the court recognized there was not going to be harm to women, that there was zero damage to women by accepting the alternative that was proposed there. And then I'd like to make simply – and another point about Burwell is that Justice Alito talked about Title VII specifically or talked about discrimination in hiring and said that RFRA provides no shield to discrimination in hiring since the government has a compelling interest in providing equal opportunity to participate in the workplace without regard to race and prohibitions on racial discrimination are precisely tailored to achieve that critical goal. And we believe that Title VII is precisely tailored, and therefore it should be enforced in general to stop discrimination, that there should not be a RFRA defense. Here, the court's analysis with respect to least restrictive alternative had a number of problems. One of those is that it simply – because of the narrow way the court reviewed or described the compelling interest, he looked only at the dress code. And so he said – he suggested that the EEOC could simply get rid of the dress code or get rid of the dress code, and that that would end the burden on the funeral home. The problem, of course, was that my client had been fired, and so that was simply not going to address the Title VII's interest or the government's interest in passing Title VII to stop discrimination. The district court didn't have any remedy then to rectify the firing. It was only – It offered no remedy to rectify the firing at all. The court had a remedy, it just didn't use it, right? The court could have ordered her back and ordered a uniform dress code. And back pay, as well as – and there were damages to my client in terms of the emotional distress. This was summary judgment, right? This was summary judgment with respect to liability, so damages had not been addressed yet by the court. I see your red light is on. Yes, thank you, Your Honor. We have your time for rebuttal. Your Honors, may it please the Court. I'm Doug Wardlow, representing R.G. and G.R. Harris Funeral Homes. This case concerns the right of an employer, Tom Ross, to control the public face of his business and ministry. And in this case, that business is a ministry because Tom Ross feels a religious calling to serve the grieving. I'm losing the end of your sentences. I'm sorry. Thank you, Your Honor. Speak up. So the EEOC and Stevens claim that Title VII eviscerates Tom Ross' right to control the public face of his business through a sex-specific dress code. So could he have a policy based on his true, sincere religion, a very small religion, that he should only employ men? Well, if that was the case… Yes, that's the hypo. Considering that hypothetical, first I would say that that would be a different situation because there we would have a situation where we have a compelling interest in eradicating sex discrimination. But you're conceding then that what you're saying that there's a substantial burden, and then you're agreeing that there is a compelling interest on the other side. There would be a substantial burden in that hypothetical, and then we'd have to look at the specifics of that particular case to see if there was a compelling interest that's specific to the person claiming religious exemption. Now, in our case, it's a little bit different because there isn't any sex discrimination. What we're talking about is sex stereotyping. And there's no compelling interest in eradicating sex stereotyping because you don't have sex discrimination unless sex stereotyping results in a disparate impact on one sex or the other sex. And that's really the point. So moving first into the sex discrimination piece of this. You said that your client should have the right to control the face of the business, but in the business, he hired men and women, correct? That's correct, Your Honor. And in the business, he professed to service basically people of all religions or no religions or whatever. So it's basically sort of an all-come. So why is this inconsistent? How are they consistent with his professed business model of servicing all people and hiring men and women? Because Ms. Stevens said, I want to present as my true self, a woman. Well, Harris Funeral Homes serves all comers, and that's what Tom Ross feels that his religious calling is to do, to care for and minister to the grieving. And that is based on his Christian principles. He also operates the business according to the tenets of his faith, including the principle that sex is an immutable gift from God. Now to employ Stevens, when Stevens is violating the sex-specific dress code and dressing as a woman, when Ross knows that Stevens is not a woman, would send a message to the public in a public-facing position representing the funeral home that is contrary to his deeply, sincerely held belief that sex is an immutable gift from God. So would he embalm and bury transgendered individuals upon their death? I don't know the answer to that question with certitude, but I can say this. That embalming a transgender person would not send any kind of message that contradicts his sincerely held religious belief about sex. Because embalming a person serving a client in that way, that would be part of his religious calling. But it wouldn't send a message to the public that he believes that sex is immutable. So if somebody had a religion where they believed that their religion was the true religion, and that everybody else who believed in other religions was violating the true principles, would they be able to prevent anyone else from working for their business that was not adherent to their faith? I don't think so, Your Honor. We'd have to look at the specifics of the particular hypothetical. You'd have to go through the RFRA analysis and see if there's that exercise of religion and then a substantial burden, and then look to whether there's a compelling interest in the least restrictive means available. And the RFRA is designed... I'm trying to figure out what the difference between my hypos, which are purposefully trying to be very extreme, and the actual case. What is the real difference legally, except for the fact that this is a very small group of people here, as opposed to barring all women or barring anybody who isn't of this particular religion? Well, one of the differences, Your Honor, is that legally here there is no compelling interest, because there's no compelling interest in eradicating sex stereotyping generally, unless there's a disparate impact between men and women. And we don't have a disparate impact here because the sex-specific dress code applies evenly to men and women. And what case are you relying on? Well, I would point to actually Price-Waterhouse for that proposition, as well as the Jesperson case out of the Ninth Circuit. But in Price-Waterhouse... Yeah, how does Price-Waterhouse help you? Price-Waterhouse is very helpful, Your Honor, because Price-Waterhouse actually states very clearly that Congress's intent in prohibiting sex discrimination was to strike at the entire spectrum of disparate treatment between men and women resulting from sex stereotypes. So there, you see right there, between men and women means there's a disparity between men and women, and then it results from sex stereotypes. So sex stereotyping is not an independent vehicle for relief, which is what Judge Pryor pointed out in his concurrence in the evidence. So you're saying Barnes and Smith are just, we should ignore them? Oh, not at all, Your Honor. I don't think that Barnes and Smith dealt with dress codes, although they did not deal with dress codes. And they don't stand for the proposition that all sex stereotyping, regardless of disparate impact, is necessarily problematic under Title VII. Particularly in Smith, which involved firefighters, all firefighters had to wear the same firefighting equipment. No dress code was involved, and the panel in Smith actually amended its opinion to remove the piece of that opinion that would have said that transgender status is essentially protected under Title VII. But Smith is not a case that holds that you don't need to consider disparate impact. You need to look to Price-Waterhouse, which requires that disparate impact analysis. And to hold otherwise would be to strike down all sex-specific dress codes simply because they're sex-specific, and no court has ever gone that far. What does the record say as to the basis for the firing here? Well, the record is very clear as to the basis for the firing. In Stevens' own deposition, Stevens testified that his understanding from what Ross told him was that Stevens coming to work dressed as a woman was not going to be acceptable. And that's at page ID 1456. And Ross did inform Stevens that he could not violate the dress code for male funeral directors, and that's at page ID 1371. And it is because of Ross' belief that people should not change their sex? The dress code is in place in part because of Ross' belief that people should not change their sex, but more generally it's because Ross believes that he's called to the Ministry of Caring for Grieving People. He believes what? Because he believes he's called to the Ministry of Caring for Grieving People. In order to be sensitive to grieving people, he has a dress code in place in his industry standard to make sure there are no distractions or other interruptions to people who are bereaved. And that's why the dress code's in place. But the business is also informed by his religious tenets, including his belief that sex is an immutable gift from God that should not be changed. So it seems a little bit narrowing, your approach, that it's only a dress code case, if it's based on his immutable beliefs that people should not change their sex. If he was compelled to have Stevens in a public-facing position dressing as a woman, violating the dress code, that would contradict his sincerely held religious belief that people should not attempt to change their sex because sex is an immutable gift from God. So what if Stevens is public-facing and wearing a dark suit, albeit a woman's dark suit? The dress code talked about suits and ties and white shirts for men and suits or dresses of a dark nature for women. So it seems to me that focusing narrowly on the dress code just seems almost a little bit specious to me because Amy Stevens could certainly present in a dark suit, couldn't she? Well, perhaps she could, but the dress code is in place. Well, first of all, it's not up – the corps should not – when you're looking under RFRA, at least, when you're looking under RFRA, the less restrictive means aren't means that require the employer to change their practices. Yeah, but you're saying it's the dress code, and I'm saying that. That seems very narrow because of the examples I gave. Well, it is about the dress code that the testimony in the record is very clear, that that is the reason that Ross gave for the firing, and that was Stevens' understanding of the reason for the termination as well. And so that's why the dress code is so important. And it was the enforcement of that dress code that led to – and that's why it's so central to the case. But putting that to the side, the simple fact of forcing Stevens – of forcing Ross to employ Stevens in a public-facing position would violate his religious belief concerning the immutability of sex. Because Stevens was fired before he actually showed up wearing female clothing, correct? That's correct, Your Honor. So Stevens was terminated – Stevens indicated to Ross that he would return from vacation after two weeks and then be dressing and presenting as a woman. And then shortly thereafter, Ross informed Stevens of the discharge, and the reason was that it wouldn't work with the company's dress code. I'm curious – I know you have a limited amount of time, and I do want you to get to the other issue of the inclusion of the challenge to the disparate availability of financial remuneration for men and women vis-à-vis their clothing allowance. So be sure to save time to address that. I don't want to interfere with your argument now. Very good. So is your main argument that Pricewaterhouse doesn't apply unless there's some sort of disparate impact between genders? With respect to the alternative basis for affirming the district court, that there is no sex discrimination, yes. That is the core of the argument, that if there is no disparate impact, then there is no sex discrimination. That's clear from Pricewaterhouse itself, and it's also clear from the position of the Justice Department in Zarda v. Altitude Express speaking for the United States. And that's a Second Circuit case where the Justice Department is arguing for affirmance of the decision of a panel of the Second Circuit where the Justice Department took the position that sex stereotyping that does not cause a disparate impact does not constitute sex discrimination. And I can give you the site, which is 2017 Westlaw 3277292. But yes, Your Honor, that is really at the heart of the case. But turning to the RFRA defense, there is religious exercise here that's protected by RFRA. The undisputed record evidence shows that Ross' faith compels him to serve the grieving. So the business is not just a business, it's a ministry. In addition, he operates it consistently with the tenets of his faith, including his belief that sex is an immutable gift from God. And for that reason, Ross will not purchase attire for the opposite sex, for a person that's claiming to be a member of the opposite sex. So just as Hobby Lobby's religiously motivated business practice of declining to pay for its employees' abortion-inducing drugs is a protected religious exercise under RFRA, so too is RG's religiously motivated policy prohibiting public-facing representatives of the company from wearing the uniform for the opposite sex. So what we really have here is two different ways that the religious exercise is substantially burdened. One, because Ross would be forced to pay for and thus facilitate the cross-dressing of Stevens. And then secondly- How is he forced to pay for if when the case started, i.e. when Stevens was fired, females were not provided any clothing allowance, and therefore Amy Stevens would not be getting any clothing allowance when she came back after her two-week vacation? Well, that's not exactly correct, Your Honor. The record is very clear- It was a question, so I don't know how you can say my question is incorrect. The record is very clear, Your Honor, that when you look at the position of funeral director, that RG would provide company-issued suits to male and female funeral directors. Oh, so before this case arose, funeral directors were provided, male and female? That's correct, Your Honor. Funeral directors. You didn't have any female directors since the 50s or something? That's correct. There haven't been any female funeral directors for quite some time, but the record is clear that there simply haven't been any females that have applied for, that have been qualified for the position of funeral director for quite some time. And was Stevens a funeral director? And Stevens was a funeral director. So the dress code, I'm sorry, the clothing allowance provisions are different depending on the position. And for funeral directors, because it's the position that is most in contact with grieving families and the public, the dress code is very clear and the provision is that the company actually provides the conservative suits to the funeral director. So there would be no disparity. I appreciate your clarification of the record. The fact was, according to the record, according to you, that other public-facing employees other than funeral directors were, the men were given an allowance, but the women were not. So with respect to the clothing allowance, when you look at positions other than funeral directors, since October 2014, public-facing employees other than funeral directors, male employees have received a company-issued suit and female employees have received a clothing allowance that is equivalent in value to allow the females to purchase clothing that meets the dress code requirements. And that's since the filing of this case? Since October, yes, 2014. But prior to that, funeral directors, all funeral directors are provided with company-issued suits. And so there's no disparate impact there. It's interesting how you can say that all funeral directors, and you don't have a problem when there were no female funeral directors and you had a different policy vis-à-vis the other outwardly publicly-facing people. It's an interesting situation. Well, the record is very clear that Rost would provide female funeral directors with company-issued suits. How is the record clear on that, just the testimony of Rost? That would be the testimony of Rost, that's correct. That hypothetically he would provide them if he had any female funeral directors? He certainly would because the policy of the company is to provide company-issued suits to all funeral directors. So moving on to the compelling interest analysis under RFRA. Again, the substantial burden is either requiring Rost to pay for and provide company-issued suits or putting an employee in a public-facing position, sending a message that contradicts his sincerely held religious beliefs. Now, with respect to compelling interest, under Hobby Lobby, it's not enough, and also under Gonzales, it's not enough to simply say that there is a compelling interest, a broad compelling interest in ending discrimination of any type. You need to actually point at a specific compelling interest, a specific to the person claiming the religious exemption, and that's the language from Hobby Lobby and Gonzales. And so the question then would be, does the government have a specific compelling interest in enforcing Rost to allow Stevens to be in a public-facing position and contradicting the owner's religious beliefs? And the EEOC and Stevens haven't demonstrated that. Could you see it being broadened to say the compelling interest is in Stevens not being fired for this reason as opposed to just focusing on a compelling interest in the clothing that is worn? Well, no, Your Honor, because the compelling interest needs to look at what is the compelling interest with respect to the person claiming the religious exemption. And Stevens' claim, hypothetically, would be that he should not be fired because he is transitioning to become Amy and want to be treated as such. That may be what Stevens claims, but then again, there is no compelling interest in eradicating sex-stereotyping discrimination unless there's a disparate impact between the sexes, and there is none here. I guess I get back to Price Waterhouse. So in Price Waterhouse, the woman was viewed by the employer as not being sufficiently feminine and was able to be fired for that reason. So I would think that your position would be difficult to square with the holding in Price Waterhouse. Actually, the holding in Price Waterhouse, in Price Waterhouse, Anne Hopkins, of course, was terminated because she wasn't sufficiently aggressive, wasn't sufficiently forward and assertive. And the court looked to sex-stereotyping as a proxy to prove out sex discrimination and show that disparate impact, but there was a disparate impact in Price Waterhouse because, as the court described, the trait aggressiveness for which Anne Hopkins was terminated, because she didn't have that trait, was actually required in order to succeed in the job. So by imposing that sex stereotype, it allowed male employees to advance in the company, but not female employees. And so there you have the disparate impact as between male and female employees. But that's simply not the case that we have before us, because in this case we have the enforcement of a sex-specific dress code that's evenly applied. So if a biological woman had decided to dress as a man or present as a man in violation of the dress code, they would have been disciplined just as Stevens was. So there's no disparate impact and thus no sex discrimination under Price Waterhouse. Now, just quickly returning to the RFRA defense, to respond to a few of the things that counsel for appellants said, the Cutter case, the Establishment Clause issue, that's really not an issue here. In Cutter, the question was whether the Religious Land Use and Institutionalized Persons Act was problematic because it created an Establishment Clause problem. And the court said, no, that it is not. And so it's not at all similar to the situation that we have in this case. There's simply no Establishment Clause problem here because no particular religion is being furthered or fostered by providing a narrow exemption to a ROST in this case. And that, of course, is what RFRA does. It provides an exemption from the application of a law. And that will necessarily mean that the law does not do in the particular instance what it normally would do. So you can't simply, so appellants should not be able to simply say, well, Stevens would be terminated and stopping the termination is a compelling interest because RFRA does, by its nature, provide exemptions. And the language of RFRA is very broad. It applies to all federal laws passed before or after RFRA and their application. And so in this instance, the application of Title VII should be barred by RFRA. And I would note that appellants and intervenors, neither appellants nor intervenors, have pointed to any case involving RFRA that stands for the proposition that RFRA cannot apply to exempt a Title VII action. And finally, with respect to least restrictive means. So the EEOC's burden is very, very heavy in this case to show that there is a compelling interest and also that there's no less restrictive alternative. And here there would be a less restrictive. No what? No less restrictive alternative. And here there would be a less restrictive alternative, and it could be simply prohibiting employers from terminating people for dressing not in conformity with their biological sex when they're outside of working hours. Of course, in this case, the records are very clear that Ross would not have terminated Stevens if Stevens had simply indicated an intent to dress and present as a woman outside of work while not representing the company. But, I mean, it's almost as if you're arguing that dressing consistent with your assigned gender is a qualification of the job. It's not a qualification of the job, Your Honor, but it's Ross' sincerely held religious belief that sex should not be changed and cannot be changed. And to allow somebody to dress inconsistently in a public-facing position would send a message that contradicts Ross' beliefs. I'm not hearing. You said the public-facing position what? To force Ross to allow Stevens to be in a public-facing position representing the company while dressing as a woman would send a message that clearly contradicts Ross' sincerely held religious beliefs, thus burdening his sex work. Okay, but why? I don't understand the aspect that confines his religious belief to the public-facing position. I think there are two ways that Ross' religious exercise is burdened. One is he would be forced to pay for and thus facilitate the cross-dressing behavior. Secondly, he would be forced to put Stevens in a public-facing position of funeral director and thus sending a message to people that interact with funeral directors that sex is actually mutable, which would contradict his belief to the contrary. But on the pay-for side, if Ross didn't provide the costume of the funeral director or give an allowance for it, then that goes away, right? Yes, that particular argument would go away. Okay, because that's very easily dealt with. The record is very clear, Your Honor, that Ross would, in fact, pay for and provide. But he doesn't have to as part of his religion. He doesn't have to as part of his religion, but it is part of the company policy and it is something that he would normally do. So the government shouldn't be able to come in and force Ross to change the way that his company is structured. Even if it goes to issues of employment that normally the EEOC is interested in protecting? When we're talking about applying RFRA, the question is whether there's a less restrictive alternative. You don't look to see whether the employer could change the structures in order to accommodate what the government wants to do. As an enforcement agency, the EEOC could say, you can't fire this person and reach some sort of an accommodation where the employer doesn't have to pay for the uniform, right? So if I understand Your Honor's question. Is your position that it's simply the suit? So if he came in with makeup and other indicia of being a woman, it would be fine as long as he wore that company issued suit? It may or may not be fine with respect to the... I'm sorry, what? It may or may not be fine with respect to compliance with the dress code, but if Stevens came to work presenting clearly as a woman and acting as a woman, when Ross knows that Stevens is a biological male, that would contradict his sincerely held religious beliefs. That's right. So it's not just about the suit. It's about presenting as a woman. With respect to the sex discrimination claim, yes. With respect to the RIFRA defense of the sex discrimination claim, yes. If Your Honor has any more questions, I'd be happy to answer them. Otherwise, I'd ask for affirmance. Thank you. Thank you. There's a lot to cover and answer, but if I can I'd like to focus on three points unless you have questions right from the start. And the first is this idea that we don't have a compelling interest in eliminating anything but sex stereotypes as they pertain to clothing. I think this argument is very muddled. The law doesn't require there to be an impact on all women. The law under Title VII is that we protect individuals, so you don't have to show an impact on the entire class of women. I think that argument is clearly inconsistent with Price Waterhouse, where Ann Hopkins prevailed because she was singled out as being too masculine of a woman, not because all of the women in the workplace were being discriminated against. But you could reach back even further than that and go to Martin Marietta, where there's discrimination against women with school-aged children, not all women. So that argument, respectfully, I think just doesn't work here. Also, this court has said in Smith that discrimination against a plaintiff who is transsexual and therefore fails to identify with his or her gender is the same as discrimination against Ann Hopkins in Price Waterhouse, who in sex stereotypical terms did not act like a woman. So I think that your own precedent understands correctly that Price Waterhouse doesn't require you to show discrimination against everybody, discrimination against one person whose outward appearance and demeanor doesn't match expectations of her sex is enough, and that that's a compelling interest that we have to be sure that Amy Stevens can go to work dressed consistently with her gender identity, but not just dressed, but her entire appearance. Secondly, I'd like to talk about exercise of religion and whether employing somebody can interfere with a religious exercise. I think that the company has a problem legally and factually with that argument. Mr. Ross testified in his deposition at page 42 that he understands that hiring somebody whose religion is different than his is not an endorsement of that person's religion. He also testifies at page 138 of his deposition that he has employed a gay worker and he said he would not fire somebody who was an adulterer or who had an abortion. So he seems to understand that. And we pointed in our brief to the case Summers v. Wittes, which talks about an employee who had to issue same-sex marriage licenses as part of her job duties. She brought a Title VII religious discrimination case and says that interferes with my Christian beliefs. The court rejected that and said, no, you're not endorsing same-sex marriage by just executing your job duties and issuing the same-sex marriage licenses, and we invite this court to adopt that kind of analysis here. And then finally, I said at the beginning of my argument that this case really hits two important principles in our country against each other, and they're religious liberties and the right to work free of discrimination. And Justice Kennedy perhaps said it best in his concurring opinion in Hobby Lobby when he said that in America we enjoy religious exercise and it is important in our country, yet neither may that same exercise unduly restrict other persons, such as employees, in protecting their own interests, interests the law deems compelling. We ask that you reverse summary judgment. Thank you. Your Honors, I would like to address also the argument about Price Waterhouse and refer the court to the Manhart decision where the court talked about how proof of sex discrimination does not require showing that men are being treated favorably than women or vice versa. The court says that Title VII focuses on the individual, not a class of women or men. Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply. So relying on generalizations or requiring proof that all women were facing discrimination is just not what the Supreme Court has required, either in Manhart or in Price Waterhouse. I'd also like to address the record with respect to the firing here. Counsel has suggested that my client agreed that it was simply about the dress code, but my client in her testimony said that Ross told her it's not going to work. And Ross himself said that he fired the specific reason in his deposition, the specific reason he fired Stevens was that she was no longer going to represent herself as a man. And that's at page ID 1372. And as this court has noted, Ross' expression of beliefs are about her presentation as a woman or about her understanding that she's a woman, that that violated his religious beliefs that someone would be violating their beliefs with respect to their God-given nature. The implications, Your Honor, of this decision would be, and I'm sorry, I see my time is up, but I just wanted to direct the court to the fact that the implications of this decision would just be horrendous in terms of the kinds of discrimination that could be opened up by recognizing a RIFRA defense here.  The case will be submitted. And would the clerk call the next case, please.